**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 24, 2024.**



_____
**SHAD M. ROBINSON**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-70068-smr** |
| | § | |
| **Trinity Family Practice &** | § | |
| **Urgent Care PLLC,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

### MEMORANDUM OPINION AND FINAL ORDER DENYING CONFIRMATION OF DEBTOR'S SUBCHAPTER V PLAN AND <u>SETTING DEADLINE FOR DEBTOR TO FILE AN AMENDED PLAN</u>

This subchapter V bankruptcy case regarding a relatively small medical clinic in Odessa, Texas, requires the Court to decide an important issue regarding the time period for plan payments in a nonconsensual subchapter V plan under 11 U.S.C. § 1191(c)(2)(A)[1]: how does a bankruptcy court determine whether a proposed three-year period of plan payments is "fair and

---

[1] All statutory citations and references are to title 11 of the United States Code, unless otherwise noted.

equitable," or if it should "fix" a longer period not to exceed five years?[2]

Trinity Family Practice & Urgent Care, PLLC (the "Debtor") seeks confirmation of its First Amended Chapter 11 Subchapter V Plan (the "Plan" or "Debtor's Plan" at ECF No. 73). The Plan is nonconsensual and the Debtor seeks confirmation under § 1191(b). The Plan provides that the Debtor will make payments of its projected disposable income over a three-year period pursuant to § 1191(c)(2)(A).

American Momentum Bank (the "Bank") voted against the Plan and also filed an objection to the proposed three-year period of plan payments. First, the Bank asserts that the three-year period of plan payments is not proposed by the Debtor in good faith under § 1129(a)(3).[3] Second, the Bank asserts that the Court should deny confirmation because a distribution to the unsecured creditor class in the amount of $38,761.29 (or 8.2% of their claims) over the Plan's three-year payment period is not fair and equitable under § 1191(b) and (c).[4] The Bank argues that, given the minimal nature of the payment to unsecured creditors, the Court should fix a longer plan payment period.

The Debtor contends that the three-year period of payments set forth in the Plan is (1) proposed in good faith, (2) "fair and equitable," and (3) consistent with the intent of Congress to

---

[2] Congress intentionally chose the term "fix" in § 1191(c)(2)(A). The term "fix" is not defined in the Bankruptcy Code. Webster's online dictionary defines fix as "to set or place definitely; to make an accurate determination of." *Fix*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fix (last visited April 29, 2024). Accordingly, this Court holds based on the clear and unambiguous language of the statute that Congress intended that bankruptcy courts would have broad discretion to determine (or "fix" as the statute says) the applicable period for plan payments under § 1191(c)(2)(A). Unfortunately, Congress did not provide the bankruptcy courts with guidance on how to determine whether the plan duration should be three years, five years, or some other period in between. This memorandum opinion will discuss the factors considered by this Court in fixing the period of plan payments under § 1191(c)(2)(A).

[3] ECF No. 77 at 4.

[4] *Id.* Although not precisely set forth in the Bank's objection, the Bank's argument is that the Court should fix a plan payment period longer than three years because it would result in a larger payment to the unsecured creditor class. According to the Bank, the small distribution to unsecured creditors supports the argument that a longer plan payment period should be required for the Court to find that the proposed Plan is fair and equitable.

create a quick, efficient reorganization process that would allow the Debtor to obtain a discharge as soon as possible. The Debtor further argues that the proposed three-year period of plan payments properly balances the interests of the Debtor as well as the Debtor's employees, customers, and creditors. In support of its argument, the Debtor relies primarily on the bankruptcy court's opinion in *In re Urgent Care Physicians*.[5]

## I.     ISSUES PRESENTED

The first issue is whether the Debtor's three-year period of plan payments is proposed in good faith and not by any means forbidden by law as required by § 1129(a)(3).

The second issue is whether a subchapter V plan that provides for payment of all of the Debtor's projected disposable income to creditors for a period of three years is fair and equitable under § 1191(b) and (c)(2)(A), or if the Court should fix a longer plan payment period.

## II.     HOLDING

After considering the evidence presented and legal arguments of the parties, and for the reasons discussed below, the Bank's objection that the Plan is not proposed in good faith under § 1129(a)(3) is OVERRULED. However, the Bank's objection to confirmation of the Plan on the grounds that the three-year period of plan payments is not fair and equitable under § 1191(b) and (c)(2)(A) is SUSTAINED because the Court finds, based on the facts of this case, the evidence presented, and a consideration of the factors set forth below, that the Debtor has not satisfied its burden to show by a preponderance of the evidence that the proposed three-year period for plan

---

[5] *See In re Urgent Care Physicians, Ltd.*, No. 21-24000, 2021 WL 6090985 (Bankr. E.D. Wis. Dec. 20, 2021). Although not directly on point to the issues before this Court, the Ninth Circuit in *In re Orange Cnty. Bail Bonds, Inc.*, 638 B.R. 137 (B.A.P. 9th Cir. 2022) concluded that a three-year plan was "fair and equitable." In *Orange County*, the Ninth Circuit BAP held that a plan that proposed a payment on the effective date of the plan that was larger than the debtor's projected disposable income over a three-year period was fair and equitable, even though the proposed payment was not based on the disposable income calculation itself. *Id.* at 146. The *Orange County* court did not discuss what standards a bankruptcy court should apply in determining the applicable plan payment period under § 1191(c)(2).

payments is "fair and equitable" under § 1191(b) and (c)(2)(A).

Finally, the Court finds that the Debtor should be granted leave to file an amended plan on or before June 10, 2024. If the Debtor decides not to file an amended plan on or before June 10, 2024, then the case will be *sua sponte* dismissed by the Court without prejudice.[6]

## III.     JURISDICTION AND VENUE

The Court finds that it has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334(a) and (b), 11 U.S.C. §§ 1190, 1191, and 1129, and Federal Rule of Bankruptcy Procedure 3020. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(1), (b)(2)(A), and (b)(2)(L) because it involves matters concerning administration of the estate and confirmation of a chapter 11, subchapter V plan of reorganization. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The Court has authority to adjudicate this matter pursuant to the District Court's Standing Order of Reference.

## IV.     PROCEDURAL HISTORY AND FACTUAL FINDINGS[7]

The Debtor is a health care related business that started operations in May 2018 and operates a small family health urgent care clinic business in Odessa, Texas.[8] Jason Payne and Laura Payne own and operate the Debtor as its managing members. Jason Payne owns 51% of

---

[6] If the Debtor elects to file an amended plan, it should also include a redline comparing the amended plan to the original Plan filed at ECF No. 73.

[7] This Court makes its Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 as incorporated into Federal Rules of Bankruptcy Procedure 7052 and 9014. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is an inconsistency, this Memorandum Opinion controls.

[8] ECF No. 1 at 1-2; ECF No. 73 at 7.

the Debtor, and Laura Payne owns 49% of the Debtor.[9] Both Jason Payne and Laura Payne will remain managing members and retain their ownership interests post-confirmation.[10]

The Debtor filed its voluntary petition under chapter 11, subchapter V of the Bankruptcy Code[11] in the United States Bankruptcy Court for the Western District of Texas, Midland Division on June 23, 2023 (the "Petition" at ECF No. 1).

Concurrent with the filing of the Petition, the Debtor filed several financial statements and pleadings including a Statement of Operations,[12] Cash Flow Statement,[13] Balance Sheet,[14] Motion to Use Cash Collateral,[15] and Motion for Entry of an Order Authorizing Payment of Pre-Petition Wages in the Ordinary Course of Business.[16] On July 20, 2023, the Court entered orders (1) authorizing the Debtor to pay pre-petition wages,[17] (2) approving the Debtor's budget,[18] and (3) authorizing the Debtor's use of cash collateral.[19]

The Debtor has several W-2 employees, as well as separate independent contractors, that provide services.[20] The Debtor's principal, Jason Payne, is a licensed nurse practitioner and a W-2 employee of the Debtor.[21] Prior to bankruptcy and during the post-petition, pre-confirmation period, Jason Payne received bi-weekly wages of approximately $1,923.00.[22] Jason Payne testified at the confirmation hearing that he became a licensed nurse practitioner after the filing

---

[9] ECF No. 73 at 7.
[10] *Id.*
[11] The Bankruptcy Code (11 U.S.C. §§ 101–1532) will simply be referenced as the "Code" or "Bankruptcy Code" in this opinion, unless otherwise stated.
[12] ECF No. 2.
[13] ECF No. 3.
[14] ECF No. 4.
[15] ECF No. 5.
[16] ECF No. 7.
[17] ECF No. 39.
[18] ECF No. 40.
[19] *Id.*
[20] ECF No. 7 at 2.
[21] *Id.*
[22] ECF No. 7 at 2; ECF No. 5 at 6; ECF No. 40 at 4.

of the Petition.

The Debtor requested that the Court confirm its Plan as a nonconsensual plan under § 1191(b). The Plan proposes to pay creditors from its projected disposable income by continuing operations and reorganizing its debt. The Plan proposes to pay the Debtor's projected disposable income over a three-year period beginning on the date that the first payment is due under the Plan.[23] The evidence presented at the confirmation hearing shows that the Debtor anticipates having enough business and cash available to fund the Plan and pay its creditors over the three-year period proposed in the Plan.

The Debtor's Plan included projections of gross income, expenses, and operating income for the next three years which the Court considered in support of the Plan.[24] The Plan projections show total revenue as follows:

| | |
|---|---|
| Total Revenue in Year One of Plan Payments: | $1,055,360.00 |
| Total Revenue in Year Two of Plan Payments: | $1,065,913.60 |
| Total Revenue in Year Three of Plan Payments: | $1,076,572.74 |

The Plan projections further show total expenses over the three-year term of payments as follows:

| | |
|---|---|
| Total Expenses in Year One of Plan Payments: | $1,020,114.84 |
| Total Expenses in Year Two of Plan Payments: | $1,030,589.59 |
| Total Expenses in Year Three of Plan Payments: | $1,041,166.08[25] |

---

[23] ECF No. 73 at 9-10.
[24] ECF No. 73 at 17.
[25] *Id.* at 17. *See* Appendix 1 attached hereto.

Based on the revenue and expenses listed above, the projected net operating income ("NOI"), annual Plan payment (including payments to both the secured and unsecured claims), and remaining cash are as follows:

|  | NOI | Annual Plan Payment | Remaining Cash |
|---|---|---|---|
| Year One of Plan | $35,245.16 | $34,435.36 | $809.80 |
| Year Two of Plan | $35,324.01 | $33,490.44 | $1,833.57 |
| Year Three of Plan | $35,406.65 | $33,490.44 | $1,916.21[26] |

At the confirmation hearing on December 11, 2023, the Debtor offered no evidence of the basis or methodology that it utilized in calculating projected income and expenses during the three-year period of plan payments. The Debtor offered no evidence of the Debtor's historical revenue or expenses even though the Debtor has been in operation since May 2018.[27] The Debtor's schedules, which were signed by Jason Payne under oath, show gross revenue in 2021 of $1,407,787.00, gross revenue in 2022 of $1,203,604.01, and gross revenue as of June 23, 2023 (the petition date) in the amount of $408,513.67.[28] No evidence was offered to explain why gross revenue was higher in 2021 and 2022 or why gross revenue appeared to be trending down through June 2023. There was also no evidence or explanation offered to compare the historical revenues and expenses to the Plan projections.

The monthly operating reports for June 2023 through October 2023[29] were used as confirmation exhibits but no evidence or explanation was offered to show how the monthly

---

[26] *Id.* at 17. *See* Appendix 2 attached hereto.
[27] For example, the Debtor's 2022 tax return was filed at ECF No. 59 and shows gross receipts in 2022 of $1,201,569. The Debtor's projections set forth in the Plan are approximately $150,000 less per twelve-month period than the actual number from the 2022 tax return without any further explanation.
[28] ECF No. 1 at 32.
[29] ECF Nos. 42, 55, 56, 60, and 75.

operating reports support the Plan projections and the proposed three-year period of plan payments. The Debtor's principal, Jason Payne, testified that expenses increased in the Plan projections compared to the Debtor's post-petition, pre-confirmation budget largely because the Debtor has been operating on an "extremely lean budget" since the Petition date. Mr. Payne also testified that the increase in expenses in the Plan projections is attributable to (1) an increase in advertising, (2) the Debtor's intent to expand services, (3) marketing to the local college, and (4) providing other services for college students and younger families. Mr. Payne further testified that the Debtor intends to hire a back-up nurse practitioner for when he is unavailable which will be an additional expense. Finally, Mr. Payne testified that he became licensed as a nurse practitioner after the filing of the Petition and his new license—combined with his increased involvement—warrants his increased salary set forth in the Plan projections.

The Debtor's assets include cash on hand, accounts receivable, office furniture, and equipment. The liquidation analysis attached to the Plan shows that unsecured creditors would receive nothing in a liquidation.[30]

The Plan has five classes of claims. The Class 1, 2 and 5 Claimants are not impaired under the Plan and are deemed to have accepted the Plan. The Class 3 and 4 Claimants are impaired as defined by § 1124 of the Code.[31] Under the terms of the Plan, the Bank holds a bifurcated secured and unsecured claim. The Plan provides that the Bank shall have a Class 3 secured claim in the amount of $54,300.96[32] accruing interest at 8.50% per year.[33] The Bank's

---

[30] ECF No. 73 at 3, 18.
[31] 11 U.S.C. § 1124.
[32] The Bank filed a claim in the amount of $334,432.41. At the confirmation hearing the Debtor stipulated that the first $63,154.30 of the Bank's claim is secured by a first lien on the Debtor's property. The remaining $271,277.84 is unsecured. The numbers used by the Court in this section reflect what was actually included in the Plan filing.
[33] ECF No. 73 at 9.

secured claim shall be paid over three years in thirty-six equal monthly payments of $1,714.15 per month.[34] The remaining portion of the Bank's claim is treated as a Class 4 unsecured claim in the amount of $280,131.18.[35]

Class 4 of the Plan estimates total unsecured claims in the amount of $472,698.64.[36] The Plan proposes to pay Class 4 unsecured claims approximately 8.2% of the estimated total claims.[37] The Plan provides that payments will be made in thirty-six estimated monthly payments of $1,076.72 each, for a total of $38,761.29 paid to the unsecured class over the three-year period of the Plan.[38] Under the Plan, the Bank will receive $22,970.76 (or 8.2%) of its $280,131.18 allowed claim over the three-year period. The Bank voted against the Plan in both Class 3 and 4.[39]

The Bank timely filed an objection to confirmation of the Plan.[40] The Bank's objection first addressed numerous questionable expense or budget items including the following:

1.      Class 1 administrative expenses in the amount of $25,000 are high considering Debtor's counsel received a $35,000.00 retainer;[41]

2.      There is no basis or support for the values of the Bank's collateral or for the assets set forth in the liquidation analysis attached to the Plan;

3.      Salary to insiders increased from $3,235.04 per month in the budget to $7,416.00 per month in the Plan projections;

---

[34] *Id.*
[35] *Id.* at 10.
[36] *Id.*
[37] *Id.*
[38] There appears to be an error in the Debtor's calculation of the total to be paid to the unsecured creditor class. Class 4 of the Plan says $36,761.29, but it appears that the correct number is $38,761.29.
[39] ECF No. 80 at 1.
[40] ECF No. 77.
[41] *See* ECF No. 58 at 2-3. It also appears that the Debtor has made at least a $3,000.00 post-petition deposit to its counsel. *Id.* at 3.

4.     The Plan projections call for over $10,000 per year in undefined "miscellaneous expenses";

5.     The cost of accounting services increases from $1,450.00 total over the 16-week budget to $1,000.00 per month in the projections;

6.     Telephone and internet costs of $1,250.00 per month are in the projections, even though no such expenses were in the budget;

7.     Advertising expenses increase from $2,000.00 per month in the budget to $2,500.00 per month in the Plan projections.

The Bank first asserts that the Debtor's increased monthly expenses in the Plan projections are excessive when compared to the Debtor's post-petition, pre-confirmation budget, and that these increased expenses are to the detriment of the unsecured creditor class by lowering the payment to the unsecured creditors during the three-year period of plan payments.[42]

Next, the Bank contends that based on the excess expenses set forth in the Plan projections—and given that the Plan only proposes to pay an 8.2% distribution to the unsecured creditor class over a three-year payment period—the Plan is not proposed in good faith and the Debtor should be required to make plan payments for a period longer than three years.[43]

Neither the United States Trustee nor the Subchapter V Trustee objected to the Plan. At the confirmation hearing, the Debtor and the Bank stipulated that the Bank would have a secured claim in the amount of $63,154.30 and an unsecured claim in the amount of $271,277.84. The stipulation did not resolve the Bank's objections under § 1129(a)(3) or § 1191(b) and (c).

---

[42] 11 U.S.C. § 1191(c)(2)(A) provides that a subchapter V debtor must allocate all of its projected disposable income to plan payments. Section 1191(d) defines "disposable income" as "income . . . received by the debtor but not reasonably necessary to be expended . . . for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." Therefore, as business expenses increase, the amount of disposable income decreases, resulting in a smaller distribution to the unsecured creditors.

[43] ECF No. 77 at 4.

# V.     LEGAL ANALYSIS

The Court's legal analysis and discussion will address the following:

A.      Burden of Proof on Confirmation of a Subchapter V Plan

B.      Confirmation of a Subchapter V Plan Generally

C.      Good Faith Under 11 U.S.C. § 1129(a)(3)

D.      Determination of the Applicable Period of Plan Payments in a Nonconsensual Plan under 11 U.S.C. § 1191(c)(2)(A)

## A.    Burden of Proof on Confirmation of a Subchapter V Plan

The Court begins its analysis by determining the burden of proof for confirmation of a subchapter V plan. The Court holds that it is the Debtor's burden to prove by a preponderance of the evidence that a subchapter V plan (1) includes all of the contents and information required by § 1190, and (2) satisfies all of the confirmation requirements of § 1191.[44] The Debtor's burden under § 1191 includes proving that all of the applicable requirements of § 1129(a) have been satisfied and, if confirmation of a nonconsensual plan is sought pursuant to § 1191(b), also proving that the subchapter V plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the subchapter V plan.

The Court further holds that the Debtor always has the burden of proof regarding confirmation of a subchapter V plan. At the confirmation hearing, Debtor's counsel suggested that because the Bank objected to the Debtor's proposed period of plan payments under

---

[44] *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 (5th Cir. 1993) (establishing that debtor's standard of proof to establish compliance with § 1129(a) is preponderance of the evidence); *In re Abri Health Services, LLC,* No. 21-30700, 2021 WL 5095489, at *2 (Bankr. N.D. Tex. Oct. 26, 2021) ("The Debtors have the burden of proving the elements of Bankruptcy Code section 1191 and the applicable elements of section 1129(a) by a preponderance of the evidence."); *In re Double H Transp. LLC,* 603 F. Supp. 3d 468, 475 (W.D. Tex. 2022) (discussing a nonconsensual subchapter V plan, and holding that the Debtor has the burden of proving that the Plan meets the relevant requirements).

§ 1191(c)(2)(A), it was the Bank's burden to show that the three-year plan payment period was not "fair and equitable." Debtor's counsel also argued that it was the Bank's burden to show that a payment period longer than three years should be fixed by the Court.[45] This Court disagrees. A creditor voting against or objecting to a plan does not take on the burden of proof as to any of the plan confirmation requirements, including the appropriate period of plan payments under § 1191(c)(2)(A). A creditor can vote against a plan, object to a plan, assert that a plan is not confirmable for factual and/or legal reasons, challenge the reliability and credibility of the debtor's evidence, and/or offer controverting evidence in opposition; but in doing so, the creditor does not take on the burden to prove or disprove any of the subchapter V confirmation requirements.[46] The burden of proof to satisfy all confirmation requirements under subchapter V remains with the debtor, regardless of any votes against—or objections to—a plan.[47]

Based on the foregoing, the Court holds that the Debtor has the burden to show by a preponderance of the evidence that (1) the Plan was proposed in good faith and not by any means forbidden by law, and (2) the three-year period of payments proposed under the Plan is "fair and

---

[45] *See* Robert J. Keach & Adam R. Prescott, *Confirming Nonconsensual Plans in Subchapter V: Exploring the "Projected Disposable Income" Requirement and What It Means (And Does Not Mean) For Small Business Debtors*, 32 NORTON J. OF BANKR. L. & PRAC. 127, 133 (2023) (stating that deference should be given to the debtor's business judgment and suggesting that the burden is informally on the creditor to seek a longer plan period).

[46] A creditor can argue that a debtor's proposed plan payment period is not fair and equitable, offer controverting evidence against a three-year plan payment period, and/or offer evidence in support of the court fixing a longer plan payment period, but the burden at confirmation always remains on the debtor. *See* discussion *infra* Section V.D.2 regarding factors to be considered in determining whether a proposed plan payment period is fair and equitable or if the court should fix a longer plan payment period under § 1191(c)(2)(A).

[47] *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 (5th Cir. 1993) (establishing that debtor's standard of proof to establish compliance with § 1129(a) is preponderance of the evidence and finding that the debtor has the burden of proof to confirm under § 1129(a) and in a cramdown; a cramdown can only occur when an impaired class objects); *In re Abri Health Services, LLC*, No. 21-30700, 2021 WL 5095489, at *2 (Bankr. N.D. Tex. Oct. 26, 2021) ("The Debtors have the burden of proving the elements of Bankruptcy Code section 1191 and the applicable elements of section 1129(a) by a preponderance of the evidence."); *In re Double H Transp. LLC*, 603 F. Supp. 3d 468, 475 (W.D. Tex. 2022) (discussing a nonconsensual subchapter V plan, and finding that the debtor has the burden of proving that the plan meets the relevant requirements); *In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) ("To overcome the objections of an impaired class, *the proponents of a plan* must establish the facts that legitimate the impairment by a preponderance of the evidence.") (emphasis added).

equitable."

## B.    Confirmation of a Subchapter V Plan Generally

Before turning to its discussion of the good faith and fair and equitable issues specifically raised in the Bank's objection, the Court will briefly summarize the general requirements for a debtor to obtain confirmation of a subchapter V plan.

### 1.  A subchapter V plan must include all the information required by § 1190.

Although a disclosure statement is not required in subchapter V,[48] a subchapter V plan must include the information required by § 1190(1) and (2). Section 1190(1) provides that a plan shall include a brief history of the business operations of the debtor, a liquidation analysis, and financial projections that demonstrate the debtor's ability to make the plan payments.[49] Section 1190(2) provides that the plan "shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan."[50] In a nonconsensual plan like the Plan the Debtor is seeking to confirm in this case, § 1194(b) provides for the subchapter V trustee to make plan payments to creditors under the plan unless the plan or the order confirming the plan provides otherwise.[51]

No party objected that the Debtor's Plan does not include the information required by § 1190(1) or that the Plan does not satisfy § 1190(2). Furthermore, based on the Court's own independent review of the Plan, the Court finds that the Debtor's Plan contains all the

---

[48] Congress made it clear that a subchapter V plan need not be accompanied by a separate disclosure statement unless the Court rules otherwise. 11 U.S.C. §§ 1181(b) and 1187(c).

[49] 11 U.S.C. § 1190(1).

[50] 11 U.S.C. § 1190(2).

[51] 11 U.S.C. § 1194(b). The Debtor's proposed Plan in Article VIII(F) provides that the Debtor will make the plan payments to the creditors and there have been no objections to the Debtor making the plan payments. ECF No. 73 at 13.

information required by § 1190(1).[52] The Court further finds that the Debtor's Plan meets the requirements of §§ 1190(2) and 1194(b).[53]

Now that the Court has determined that the Debtor's Plan meets the requisite requirements of a subchapter V plan under § 1190(1) and (2), the Court must address whether the Debtor's Plan satisfies the confirmation requirements in § 1191.

### 2. A subchapter V plan must satisfy the requirements of § 1191.

#### i. Consensual Plan under § 1191(a)

A subchapter V plan confirmed pursuant to § 1191(a) is generally referred to as a "consensual plan." In order for the Court to confirm a consensual subchapter V plan under 11 U.S.C. § 1191(a), all of the applicable requirements of § 1129(a) must be satisfied except for the projected disposable income rule of paragraph (a)(15).[54] Because § 1129(a)(8) requires acceptance of the plan by all impaired classes, confirmation of a subchapter V plan under § 1191(a) can occur only if all impaired classes have accepted the plan. In this case, the Bank is impaired, voted against the Plan, and filed an objection to the Plan; therefore, the Debtor is not moving forward with a consensual plan, § 1191(a) does not apply, and no further analysis of § 1191(a) is necessary.

---

[52] *See Matter of Williams*, 850 F.2d 250, 253 (5th Cir. 1988) ("[T]he court has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation.") (quoting *In re Holthoff*, 58 B.R. 216, 218 (Bankr. E.D. Ark. 1985)). The Court notes that the brief history of the business operations of the Debtor set forth in the Plan in this case is minimal at best; however, the Court will approve in this case for purposes of § 1190(1) absent an objection.

[53] With respect to a nonconsensual plan providing that the debtor rather than the subchapter V trustee will make payments to creditors under § 1190(1), this Court generally requires the debtor to show "cause" for the debtor making the plan payments (i.e., acting as the disbursing agent under a nonconsensual plan). If the debtor shows cause, then the Court will generally permit the debtor to act as the disbursing agent under a nonconsensual plan.

[54] 11 U.S.C. § 1191(a).

### ii. Nonconsensual Plan under § 1191(b)

A subchapter V plan confirmed pursuant to § 1191(b) is generally referred to as a "nonconsensual plan" or "cramdown plan."[55] If a subchapter V debtor is not able to obtain a consensual subchapter V plan under § 1191(a) because one or more impaired classes of claims or interests rejects the plan, then § 1191(b) sets forth the requirements for confirmation of a nonconsensual subchapter V plan. Section 1191(b) replaces the confirmation requirements of § 1129(b).[56] Instead, § 1191(b) provides that the court shall confirm a subchapter V plan that satisfies the confirmation requirements under § 1129(a)—other than the requirements of § 1129(a)(8),[57] (a)(10),[58] and (a)(15)[59]—if the proposed subchapter V plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the subchapter V plan.[60] The Debtor in this case is seeking confirmation of its Plan under § 1191(b), so the Court must consider the specific confirmation requirements under § 1191(b) and (c).

---

[55] *See In re Sunflower Racing, Inc.*, 219 B.R. 587, 590 (Bankr. D. Kan. 1998) ("*Cram down* is a colloquial expression used in bankruptcy practice to signify confirmation of a reorganization plan notwithstanding the negative vote of a secured creditor class—the court figuratively crams the plan down the throat of the dissenting class.").

[56] The statute makes it clear that § 1129(b) generally does not apply in a subchapter V case. 11 U.S.C. § 1181(a). Notwithstanding the foregoing, § 1191(c)(1) expressly provides that "fair and equitable" as to a secured class shall satisfy the requirements of § 1129(b)(2)(A). *See infra* note 61.

[57] 11 U.S.C. § 1129(a)(8) requires that each class of claims either (1) votes to accept the plan, or (2) is not impaired by the plan.

[58] 11 U.S.C. § 1129(a)(10) requires that, if a class is impaired under the plan, at least one class of impaired claims has voted to accept the plan.

[59] 11 U.S.C. § 1129(a)(15) requires that unsecured creditors are either paid in full under the plan, or the debtor must devote projected disposable income to the plan for at least five years.

[60] 11 U.S.C. § 1191(b).

### 3. A nonconsensual subchapter V plan must satisfy the requirements of 11 U.S.C. § 1191(b) and (c).[61]

To confirm a subchapter V plan nonconsensually under § 1191(b), the Court must find that the plan does not discriminate unfairly[62] and that the plan is fair and equitable with respect to each class of impaired claims or interests that has not accepted the plan. While the standards for unfair discrimination under § 1191(b) are the same as under § 1129(b)(1)—which is applicable to other chapter 11 cases[63]—what is "fair and equitable" with respect to unsecured creditors in a subchapter V is determined under the requirements of § 1191(c), *not* § 1129(b).[64]

Section 1191(c) establishes the fair and equitable test for unsecured creditors in subchapter V plans and adopts a standard that is different than that set forth in § 1129(b). The "fair and equitable" test for unsecured creditors in a subchapter V plan is set forth in § 1191(c) and has three requirements. First, a plan is fair and equitable if, as of the effective date, the plan provides that (a) all of the debtor's projected disposable income for a three-to-five-year period fixed by the court will be applied to make payments under the plan, or (b) the value of the property to be distributed under the plan during the three-to-five-year period is not less than the projected disposable income of the debtor.[65] Second, the plan must be feasible, meaning that the debtor will be able to make all plan payments or there is a reasonable likelihood that the debtor

---

[61] The "fair and equitable" standard under 11 U.S.C. § 1191(b) and (c) is different for secured creditors and unsecured creditors. Section 1191(c)(1) expressly incorporates the "fair and equitable" definition for treatment of secured creditors under § 1129(b)(2)(A). In this case, the parties have stipulated to the amount of the Bank's secured claim and the payments on such secured claim, so the Plan satisfies §§ 1191(c) and 1129(b)(2)(A). Therefore, it is not necessary for the Court to analyze whether the Plan is fair and equitable as to secured creditors.

[62] There was no objection or assertion that the Plan discriminates unfairly, and the Court specifically finds that the Plan does not discriminate unfairly, so the Court will not address this issue.

[63] *In re Pearl Res. LLC*, 622 B.R. 236, 265 (Bankr. S.D. Tex. 2020) ("[S]ubchapter V does not affect any change in the unfair discrimination requirement . . . .").

[64] *Id.* ("[Section] 1191(c) does provision a new 'rule of construction' in subchapter V cases for the condition that a plan be 'fair and equitable,' replacing the detailed definition of that term contained in § 1129(b).").

[65] 11 U.S.C. § 1191(c)(2)(A) and (B).

will be able to make the payments.[66] Third, the plan must provide appropriate remedies to protect the holders of claims or interests if the payments are not made.[67]

The Debtor in this case has satisfied its burden to show that there is a reasonable likelihood that the Debtor will be able to make the plan payments, and that the Plan provides appropriate remedies to protect the holders of claims or interests if the payments are not made. Thus, the remaining issues for determination by the Court are (1) whether the Debtor's Plan was proposed in good faith under § 1129(a)(3), and (2) whether a subchapter V plan that provides for payment of all of the Debtor's projected disposable income to creditors for a period of three years is fair and equitable under § 1191(b) and (c)(2)(A), or if the Court should fix a longer payment period.[68]

## C.     Good Faith under 11 U.S.C. § 1129(a)(3)[69]

Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means forbidden by law.[70] Rule 3020(b)(2) of the Federal Rules of Bankruptcy Procedure provides that "[i]f no objection is timely filed, the court may determine that the plan has been proposed in

---

[66] 11 U.S.C. § 1191(c)(3)(A) and (B)(i) require that "the debtor will be able to make all payments under the plan; or . . . there is a reasonable likelihood that the debtor will be able to make all payments under the plan." This is commonly referred to as the "feasibility" test in subchapter V. *See Pearl Resources*, 622 B.R. at 269 (discussing § 1191(c)(3)(A) and (B) and referring to those sections as the "feasibility" requirement); *Double H*, 603 F. Supp. 3d at 475 ("there must be at least a 'reasonable likelihood that the debtor will be able to make all payments under the plan.' Courts often refer to this 'reasonable likelihood' requirement as a requirement that a plan be 'feasible' . . . .") (quoting 11 U.S.C. § 1191).

[67] 11 U.S.C. § 1191(c)(3)(B)(ii) requires that "the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made."

[68] The Bank also questions one or more of the expenses set forth in the Plan projections. The Court will not address the specifics of each expense identified by the Bank but does address the Plan projections generally as a factor in the context of its analysis of determining the plan period.

[69] Based on the arguments of the parties, the evidence presented, and the Court's own review of the Plan, the Court finds that the Debtor has met its burden on all of the applicable requirements of 11 U.S.C. § 1129, but will briefly discuss § 1129(a)(3) separately since it was specifically raised in the Bank's objection.

[70] 11 U.S.C. § 1129(a)(3).

good faith and not by any means forbidden by law without receiving evidence on such issues."[71] In this case the Bank objected, asserting that the Debtor's Plan was not proposed in good faith because the Debtor could pay more to the unsecured creditors if the period for plan payments were extended to five years. Because of the Bank's objection, Rule 3020(b)(2) does not apply and the Debtor has the burden of proof—which it must satisfy by a preponderance of the evidence—that the Plan was proposed in good faith and not by any means forbidden by law.[72]

The term "good faith" is not defined in the Code.[73] The Fifth Circuit has stated, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."[74] The Court's analysis of the requirement of good faith must be conducted based on the totality of circumstances "keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[75] Other bankruptcy courts have considered the following factors when evaluating "good faith" under § 1129(a)(3):

(1) whether the proposed plan promotes a result consistent with the Bankruptcy Code's objectives;

(2) whether the proposed plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and

(3) whether the debtor exhibited fundamental fairness in dealing with its creditors.[76]

---

[71] FED. R. BANKR. P. 3020.
[72] *See In re Pearl Res. LLC*, 622 B.R. 236, 260 (Bankr. S.D. Tex. 2020); *In re Abri Health Services, LLC*, No. 21-30700, 2021 WL 5095489, at *2 (Bankr. N.D. Tex. Oct. 26, 2021).
[73] *Pearl Resources*, 622 B.R. at 260.
[74] *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).
[75] *See In re Double H Transp. LLC*, 603 F. Supp. 3d 468, 477-78 (W.D. Tex. 2022).
[76] *See In re W.R. Grace & Co.*, 475 B.R. 34, 87-88 (D. Del. 2012) (quoting *Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) *aff'd*, 729 F.3d 311 (3d Cir. 2013).

Notwithstanding the foregoing factors, a bankruptcy court's determination of good faith is always made after considering the totality of the circumstances.[77] The good faith analysis under § 1129(a)(3) is examined on a case-by-case basis because good faith determinations are factually specific.[78]

The Court finds that the first factor—whether the proposed plan promotes a result consistent with the objectives of the Code—is satisfied in this case.[79] Examples of the objectives and purposes of the Bankruptcy Code include (1) allowing the debtor a fresh start, (2) preserving going concerns, (3) maximizing property available to satisfy creditors, (4) discouraging debtor misconduct, (5) expeditious liquidation and distribution of the bankruptcy estate to its creditors, and (6) achieving fundamental fairness and justice.[80] The Debtor's Plan appears to be a legitimate attempt to reorganize debts and continue as a going concern, and the proposed return to creditors is greater than liquidation.[81] Based on the evidence presented, the Court finds that the Debtor's Plan in this case was proposed with the legitimate purpose to reorganize and preserve the Debtor's medical business as a going concern.

The second factor—whether a plan has been proposed with honest and good intentions—is generally analyzed by considering whether (1) the debtor abused the judicial process, (2) the plan was proposed for ulterior motives, or (3) there is no realistic probability for an effective

---

[77] *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code.") (quoting *In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 519 (5th Cir. 1998)).

[78] *Camp Bowie*, 710 F.3d at 248.

[79] *See W.R. Grace & Co.*, 475 B.R. at 87.

[80] *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 156-57 (3d Cir. 2012); *see also In re Walker*, 628 B.R. 9, 16 (Bankr. E.D. Pa. 2021).

[81] ECF No. 73 at 3.

reorganization.[82] A plan is not filed in good faith under § 1129(a)(3) if the debtor has engaged in "misconduct in the bankruptcy proceedings, such as fraudulent misrepresentation or serious nondisclosures of material facts to the court."[83]

With regard to the third factor—fundamental fairness—the focus is on whether the terms of the plan, the debtor's dealings with its creditors, and the process followed to seek plan confirmation treated all parties fairly and comported with due process.[84] Making a determination of "honest and good intentions" and "fundamental fairness" often necessitates analyzing some overlapping facts, so it's appropriate to analyze these factors together.

There has been no evidence presented in this case that indicates that during the plan process the Debtor engaged in misconduct, made misrepresentations, failed to disclose information to the Court, proposed a plan with inaccurate or unreasonable projections, abused or misused the bankruptcy process, proposed a plan that is unfair or inconsistent with the objectives and purposes of the bankruptcy code, did not deal or negotiate appropriately and in good faith with creditors, or engaged in any other conduct that is fundamentally unfair or casts doubt on the integrity of the plan process or the Plan. To the best of the Court's knowledge the Debtor filed accurate schedules and monthly operating reports, and no party has asserted otherwise. The Debtor generally adhered to the rules and requirements of the bankruptcy process, and the Debtor's principal testified that the Plan was filed in good faith.[85] Based on these facts, the Court finds that the Plan was proposed with "honest and good intentions" and that the Debtor exhibited "fundamental fairness" when dealing with its creditors.

---

[82] *W.R. Grace & Co.*, 475 B.R. at 88.
[83] *In re Channel Clarity Holdings LLC*, No. 21-07972, 2022 WL 3710602, at *8 (Bankr. N.D. Ill. July 19, 2022) (quoting *In re River Vill. Assocs.,* 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd,* 181 B.R. 795 (E.D. Pa. 1995)).
[84] *W.R. Grace & Co.*, 475 B.R. at 89.
[85] Proffer of Jason Payne, confirmation hearing, December 12, 2023.

Furthermore, the Debtor's proposal of a three-year plan payment period as expressly permitted under § 1191(c)(2)(a), without any other type of misconduct referenced above, does not constitute lack of good faith solely because the Debtor could pay more if the proposed period of plan payments were longer.[86] The Debtor's proposal of a three-year plan payment period is not consistent with the type of misconduct, actions, and behavior often accompanying a finding of a bad faith plan proposal.[87]

Based on the foregoing and having examined the totality of the circumstances surrounding the plan process, the Debtor's conduct in proposing the Plan, and the Plan itself, the Court finds that the Debtor has satisfied its burden to show that the Plan was proposed in good faith and not by any means forbidden by law, thereby satisfying § 1129(a)(3). Accordingly, the Bank's objection that the Plan was not proposed in good faith under 11 U.S.C. § 1129(a)(3) is OVERRULED.

However, a finding that the Plan was proposed in good faith and not by any means forbidden by law under § 1129(a)(3) does not resolve, and is not outcome determinative, as to whether the Plan is fair and equitable under § 1191(b) and (c). Because "good faith" under § 1129(a)(3) and "fair and equitable" under § 1191(b) and (c) are separate and distinct confirmation requirements that must be satisfied, the Court must separately determine whether the proposed three-year payment period under the Plan is fair and equitable.[88]

---

[86] The sole fact that there might be another plan that could pay more or be better for the creditors is not sufficient grounds to find a lack of good faith under § 1129(a)(3). *See In re Boy Scouts of America and Delaware BSA, LLC*, 650 B.R. 87, 175-176 (D. Del. 2023) (collecting cases). That is a fact to be considered by the court, but it is not dispositive.

[87] *See In re Double H Transp. LLC*, 603 F. Supp. 3d 468, 477-78 (W.D. Tex. 2022) (affirming bankruptcy court's finding of bad faith where the debtor did not accurately disclose expenses, did not provide notice of the bankruptcy to its two largest creditors, and submitted projections that were incomprehensible, inconsistent, and generally not proven by any credible supporting evidence).

[88] However, the Court recognizes that some factors considered by the Court may overlap since "good faith"

**D. Determination of the Applicable Period of Plan Payments in a Nonconsensual Plan under 11 U.S.C. § 1191(c)(2)(A)**

When considering an objection to confirmation of a nonconsensual plan, a bankruptcy court's determination of whether a proposed plan period is "fair and equitable" requires more than a mechanical, check-the-box application of the requirements of § 1191(c). After the court determines that the proposed plan is in compliance with the baseline requirements of § 1191(c), the court has the "discretion to require more as a condition of finding [that the] plan is fair and equitable."[89] Indeed, the preamble of § 1191(c) reads "the condition that a plan be fair and equitable . . . *includes* the following requirements . . . ."[90] In other words, meeting the baseline requirements of § 1191(c) is a *necessary* condition for the subchapter V plan to be fair and equitable, but does not assure that the plan is fair and equitable.[91] Recognizing that § 1191(c) only establishes the baseline or minimum requirements is particularly important when an objection to confirmation asserts that a plan is not fair and equitable or requests that the court fix a longer plan payment period pursuant to § 1191(c)(2)(A). In such a situation the bankruptcy court has to decide whether the baseline requirements of § 1191(c) are fair and equitable or it should require more. In this case, the "more" would be the fixing of a longer plan payment period under § 1191(c)(2)(A).

In this case, the Debtor's proposed three-year plan payment period meets the minimum

---

and "fair and equitable" determinations are both based on the totality of the circumstances.

[89] *See In re Orange Cnty. Bail Bonds, Inc.,* 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022) ("As part of the streamlined, flexible process under subchapter V, the Bankruptcy Code sets a baseline requirement that a debtor commit three years of projected disposable income, while it also affords the bankruptcy court discretion to require more as a condition of finding a plan fair and equitable.").

[90] 11 U.S.C. § 1191(c) (emphasis added).

[91] *See Matter of D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) ("[T]echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.' Section 1129(b)(2) merely states that 'the condition that a plan be fair and equitable with respect to a class includes the following requirements . . . .' Section 102(3) of the bankruptcy code states that the word 'includes' is not limiting.") (citing 11 U.S.C. §§ 1129, 102) (internal citation omitted).

requirement set forth in § 1191(c)(2)(A), but the Bank's objection is that the three-year minimum requirement is too short and pays too little to the unsecured creditor class. The Bank asserts that the Debtor has not met its burden to show that the proposed three-year plan payment period is fair and equitable because a five-year payment period would result in a higher dividend to the unsecured creditor class. According to the Bank, the fact that the Debtor can pay more to the unsecured creditors over a five-year plan is sufficient for the Court to find that the proposed three-year Plan is not fair and equitable and fix a longer payment period as permitted under § 1191(c)(2)(A).[92]

Relying primarily on *In re Urgent Care Physicians*,[93] the Debtor replies and asserts that a three-year period of plan payments is the "default" period under § 1191(c) and is fair and equitable. The Debtor argues that under *Urgent Care* a three-year plan payment period (1) is consistent with the intent of Congress to create a quick, efficient reorganization process that would allow the Debtor to obtain a discharge as soon as possible, (2) acknowledges the risks and potential shorter life span of small businesses, and (3) properly balances the interest of the Debtor and the Debtor's creditors.[94]

In the *Urgent Care* case, the debtor proposed a three-year plan payment period. The issue before the *Urgent Care* court was whether the debtor should be required to commit to plan payments longer than the three-year statutory minimum. The United States Trustee objected to confirmation and argued that the three-year plan payment period and 3% distribution to general unsecured creditors was not fair and equitable because the debtor could pay a larger dividend to

---

[92] The Bank made the argument in a conclusory manner and offered no evidence in support of its conclusion. Presumably the Bank was simply extrapolating such conclusion by taking the Debtor's three-year Plan projections and extending them for two additional years.

[93] *In re Urgent Care Physicians, Ltd.*, No. 21-24000, 2021 WL 6090985 (Bankr. E.D. Wis. Dec. 20, 2021).

[94] Counsel for the Debtor and the Bank agreed that other than the *Urgent Care* case, there was virtually no guidance on the plan period that a court should fix under § 1191(c)(2)(A).

unsecured creditors over five years.[95] Similarly, two unsecured creditors voted against the plan and asserted that the plan should be five years in order to increase the distribution to unsecured creditors and satisfy the fair and equitable test. Conversely, one of the secured creditors argued that three years was appropriate because the secured debt was set to mature during the three-year period (and be paid in full), whereas a five-year plan period would prolong the payment on the secured debt and might result in less favorable terms. The *Urgent Care* debtor responded and asserted that (1) the three-year duration was the appropriate time period under § 1191(c)(2)(A), (2) the debtor's proposed operating reserve was necessary in the healthcare industry, (3) the debtor's principal had voluntarily agreed to accept a reduced salary to keep the debtor's business going, (4) the debtor's principal was voluntarily deferring certain post-petition wages until after the three-year plan duration in order to make the three-year plan payments work, and (5) a related entity owned by the debtor's principal agreed to defer the collection of post-petition charges owed by the debtor until after the three-year plan duration *and* agreed to allow the debtor to use an x-ray machine for a below market, flat monthly rate.[96]

Given these facts, the *Urgent Care* court then analyzed the legislative history of the Small Business Reorganization Act of 2019 ("SBRA") and determined that "a plan term of three years is more reasonable, generally speaking (or as a default), than a five-year term, absent unusual circumstances."[97] According to the *Urgent Care* court, "Congress's concern for not only small business owners, but small business employees, customers, and others who rely on such businesses, reflects an intent to balance the shorter life-span planning of small businesses and

---

[95] This is the exact same argument made by the Bank in this case.
[96] *Urgent Care*, 2021 WL 6090985, at *5 and *10.
[97] *Id.* at *10.

timely cost-effective benefits to debtors, against the benefits to creditors."[98] The *Urgent Care* court concluded that a three-year term was the fair and equitable balance between the creditor's demands and the burden upon the debtor and said in pertinent part:

> In this case, a three-year term achieves that balance, by recognizing that this small business that provides outpatient health care for urgent needs, has deferred partial salary payments to its insiders, has deferred some healthcare equipment payments, and has committed to paying at least its projected disposable income. Imposing a plan term of five years would tip that balance potentially unevenly toward creditors, because it would further defer repayments and full salary restoration to key staff. Moreover, deferring [equipment payments] potentially jeopardizes availability of that equipment. It also would mean keeping a lower-than-desirable ceiling on employee rewards for an additional 24 months, potentially jeopardizing employee retention. Forcing the debtor to assume such risks is not in the interest of the debtor's customers/patients. While at first blush the simple math of an extended plan term might seem to generate a higher payment to unsecured creditors, the inherent risks to the small business debtor of that extension could defeat the unsecured creditors' desire for greater recovery. The three-year term here is fair and equitable, as it properly balances the risks and rewards for both the debtor and its creditors. In these circumstances, the Court declines to fix a longer plan period.[99]

After careful analysis of the statutory language § 1191(c)(2)(A), the *Urgent Care* opinion, and the legislative history of the SBRA, this Court agrees with the *Urgent Care* court that the language of § 1191(c)(2)(A) creates a baseline plan payment period of three years. However, this Court disagrees with the *Urgent Care* court's statement that a three-year term is generally more reasonable than a five-year term absent "unusual circumstances."

First, the *Urgent Care* court does not discuss that it is the debtor's burden to show that a three-year plan is fair and equitable (or that some other plan term between three and five years is fair and equitable). The *Urgent Care* court's statement that a three-year term is generally more reasonable than a five-year term absent "unusual circumstances" suggests that the burden is on

---

[98] *Id.*
[99] *Id.* at *11.

the objecting party to show "unusual circumstances" that would justify the bankruptcy court fixing a longer period not to exceed five years. This appears to impermissibly shift the burden under § 1191(c)(2)(A) from the debtor to the creditor and is contrary to this Court's holding herein that the debtor has the burden of proof regarding confirmation of a subchapter V plan.[100] Second, the *Urgent Care* court does not define or discuss what it means by "unusual circumstances" and does not set forth any factors that the court considered while deciding to either approve the three-year plan payment period, or if necessary, fix a longer plan payment period not to exceed five years.

This Court will pick up where the *Urgent Care* court left off and (1) briefly discuss the statutory language of the SBRA, (2) look to other sections of the Code for possible guidance in fixing the payment period in a subchapter V plan, and (3) summarize the factors that this Court considered in analyzing whether the three year period of plan payments in this case is fair and equitable, or if the court should fix a longer period of plan payments not exceeding five years.

1. **The context of the Small Business Reorganization Act and the unique language of § 1191(c) suggests that the bankruptcy court must determine on a case-by-case basis whether a three-year plan is "fair and equitable."**

   i. *Brief Context of the SBRA and Subchapter V*

Effective February 19, 2020, the SBRA added new subchapter V provisions[101] designed to streamline the reorganization process for small business debtors and provide a fast track for

---

[100] *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 (5th Cir. 1993) (establishing that debtor's standard of proof to establish compliance with § 1129(a) is preponderance of the evidence); *In re Abri Health Services, LLC,* No. 21-30700, 2021 WL 5095489, at *2 (Bankr. N.D. Tex. Oct. 26, 2021) ("The Debtors have the burden of proving the elements of Bankruptcy Code section 1191 and the applicable elements of section 1129(a) by a preponderance of the evidence."); *In re Double H Transp. LLC,* 603 F. Supp. 3d 468, 475 (W.D. Tex. 2022) (discussing a nonconsensual subchapter V plan, and holding that the debtor has the burden of proving that the plan meets the relevant requirements).

[101] Subchapter V is codified at 11 U.S.C. §§ 1181-1195.

small businesses to confirm a plan.[102] It is clear that Congress enacted subchapter V as an "expedited process for small business debtors to reorganize quickly, inexpensively, and efficiently."[103] With these goals in mind, the SBRA changed the chapter 11 plan process for small business debtors in several key ways including, but not limited to:

1.      A subchapter V trustee is appointed in every case to assist with facilitating a consensual plan.

2.      The court conducts a mandatory status conference within the first 60 days of the case to ascertain status including progress toward filing a consensual plan.

3.      A status report must be filed by the debtor prior to the status conference.

4.      There is no required disclosure statement or mandatory unsecured creditors' committee (unless otherwise ordered by the court).

5.      Only the debtor may file a plan and it must generally do so within 90 days of the petition date.

6.      The absolute priority rule does not apply.

7.      With regard to impaired classes other than the secured class, a nonconsensual plan must provide that all of the debtor's projected disposable income for a three-to-five-year period will be applied to make payments under the plan.

With regard to the requirement that a subchapter V debtor must pay all of its projected disposable income to creditors over a three-to-five-year plan period in a nonconsensual plan,

---

[102] H.R. REP. NO. 116-171, at 1 (2019); *Urgent Care*, 2021 WL 6090985, at *10.
[103] *See In re Orange Cnty. Bail Bonds, Inc.*, 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022) (quoting *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 336 (Bankr. S.D. Fla. 2020)); *see also In re Progressive Sols., Inc.*, 615 B.R. 894, 900 (Bankr. C.D. Cal. 2020).

Congress provided no guidance or standards on how the bankruptcy court should fix the duration of a plan under 11 U.S.C. § 1191(c)(2)(A).

Section 1191(c)(2)(A) simply provides in pertinent part that, before a plan may be considered "fair and equitable," the plan must "provide[] that all of the projected disposable income of the debtor to be received in the *3-year period, or such longer period not to exceed 5 years as the court may fix,* beginning on the date that the first payment is due under the plan will be applied to make payments under the plan."[104] Based on the plain and ordinary reading of the statute, this Court agrees with the *Urgent Care* court that the language of § 1191(c)(2)(A) creates a baseline (or default) plan term of three years. However, based on the same plain and ordinary reading of the statute, this Court further concludes that Congress intended to leave to the sound discretion of the bankruptcy courts the sole authority to fix the plan payment period in subchapter V cases.[105] Indeed, when discussing plan length requirements, § 1191(c)(2)(A) clearly and unambiguously states "[the plan provides for a] 3-year period, or such longer period not to exceed 5 years as the court may fix . . . ."[106] Before reaching the conclusion that bankruptcy courts have discretion to determine the applicable plan payment period in subchapter V cases, this Court reviewed and analyzed other sections of the Code for guidance. Unfortunately, the relevant statutes governing the applicable period for plan payments under

---

[104] 11 U.S.C. § 1191(c) (emphasis added).

[105] *See In re Orange Cnty. Bail Bonds, Inc.,* 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022) ("As part of the streamlined, flexible process under subchapter V, the Bankruptcy Code sets a baseline requirement that a debtor commit three years of projected disposable income, while it also affords the bankruptcy court discretion to require more as a condition of finding a plan fair and equitable."). Furthermore, Judge Paul W. Bonapfel in his excellent and detailed summary of the SBRA provides: "[t]he court's authority to fix the commitment period [under 11 U.S.C. § 1191(c)(2)] implies that the court may raise the issue [of plan duration] *sua sponte.*" *See* Hon. Paul W. Bonapfel, *Guide to the Small Business Reorganization Act of 2019* at 152 (2020). A copy of this guide is available at https://www.ganb.uscourts.gov/sites/default/files/sbra_guide_pwb.pdf. Judge Bonapfel originally issued the Guide in February 2020 and has updated the Guide several times. This Court reviewed the version that was revised and updated in June 2022.

[106] 11 U.S.C. § 1191(c)(2)(A).

other sections of the Code are so dissimilar to subchapter V that they do not provide any helpful guidance in determining the appropriate time period for fixing plan payments under § 1191(c)(2)(A).

   *ii.* *Comparative Analysis of § 1191(c)(2) to other Similar Sections in the Code*

  The Court has reviewed and analyzed the statutory language regarding plan duration in chapter 12, chapter 13, and traditional individual chapter 11 cases under the Code, but the bankruptcy court's discretion to choose the period of plan payments is unique to subchapter V; thus, the statutory language and case law regarding plan payments under other chapters of the Code provides no guidance.

  For example, in a chapter 12 case, a plan may not provide for payments in excess of three years unless the court, for cause, approves a longer period up to five years.[107] However, § 1222(c) says "unless the court for cause approves" and § 1191(c)(2)(A) says "as the court may fix." Congress was well aware of the "for cause" standard in chapter 12 when it drafted subchapter V and intentionally chose the phrase "as the court may fix" rather than incorporating the same "for cause" standard from chapter 12 into subchapter V. This strongly indicates that "as the court may fix" is a different standard than "for cause." Indeed, the language of § 1191(c)(2)(A) clearly provides bankruptcy courts the discretion to fix a longer period not exceeding five years without any "for cause" finding whatsoever. In short, because the standard to extend a plan period beyond three years is different under chapter 12, case law under chapter 12 is of little help to the Court's analysis and determination of the period of plan payments that the Court should "fix" under § 1191(c)(2)(A).

---

[107] *See* 11 U.S.C. §§ 1225(b)(1)(B) and 1222(c). Approval of a longer period in a chapter 12 case extends the payment period for the period that the court approves, but the chapter 12 debtor chooses the commitment period. 11 U.S.C. §§ 1225(b)(1)(B), 1221, and 1222(c).

In chapter 13 cases, the bankruptcy court does not determine the plan period. Section 1325(b)(4) establishes the "applicable commitment period" as three years for a below-median debtor and five years for an above-median debtor.[108] The bankruptcy court has no discretion in chapter 13, so chapter 13 and cases thereunder do not provide any help in the Court's interpretation of "as the court may fix" under § 1191(c)(2)(A).

Finally, in a traditional chapter 11 case of an individual, § 1129(a)(15) sets a minimum plan period of five years or a longer period if the plan provides payments for a longer period.[109] First, in a traditional chapter 11 case of an individual, the terms of the plan determine the period of plan payments, not the bankruptcy court. Second, subchapter V specifically rejects the five-year term for individual subchapter V debtors per § 1181(a) that provides that § 1129(a)(15) shall not apply in subchapter V. Based on the forgoing, a traditional chapter 11 case of an individual is five years by statute and is simply not applicable to the bankruptcy court "fixing" a plan period under § 1191(c)(2).

In sum, subchapter V is unique in that it gives the bankruptcy court the sole authority and discretion to fix a plan payment period longer than the baseline three-year period set by § 1191(c)(2)(A). However, Congress provided bankruptcy courts no guidance or standards in § 1191(c)(2)(A) for fixing a longer plan payment period. Other sections of the Code provide no helpful guidance either. Therefore, this Court must determine what factors to consider in deciding whether a three-year period for plan payments is "fair and equitable," or if it should fix some other period not exceeding five years under § 1191(c)(2)(A).

---

[108] 11 U.S.C. § 1325.
[109] 11 U.S.C. § 1129.

## 2. The Court should consider multiple factors when evaluating whether the term of a proposed plan is "fair and equitable" under 11 U.S.C. § 1191(b) and (c).

Based on the foregoing, this Court concludes that it has broad discretion in deciding whether the proposed term of the Plan in this case is fair and equitable under 11 U.S.C. § 1191(b) and (c), or if it should fix some other period not exceeding five years under § 1191(c)(2)(A).

The Court starts its analysis with the language of subchapter V. Section 1189 provides that only the debtor may file a subchapter V plan. Section § 1191(c)(2)(A) provides that the baseline plan payment period is three years. Thus, reading § 1189 and § 1191(c)(2)(A) together is instructive and demonstrates that the bankruptcy court should give appropriate deference to the debtor's business judgment and proposed period of payments in its subchapter V plan. Furthermore, this Court agrees that a baseline plan payment period of three years is consistent with the intent of Congress to create a quick, efficient reorganization process that would allow the debtor to obtain a discharge as soon as possible. The three-year baseline period also acknowledges the shorter life span of the average small business, while properly balancing the competing interests of debtors and creditors.[110]

Assuming there is no objection to the proposed period of plan payments, it would likely be uncommon for the bankruptcy court to *sua sponte* raise the issue of the proposed period of plan payments. However, per the language used in § 1191(c)(2)(A) it appears that the bankruptcy court could decide to raise the payment period issue *sua sponte* and appropriately exercise its

---

[110] *See Urgent Care*, 2021 WL 6090985, at *10 ("Congress's recognition that small businesses typically have shorter life-spans than large businesses suggests that a plan term of three years is more reasonable, generally speaking . . . Congress's concern for not only small business owners, but small business employees, customers, and others who rely on such businesses, reflects an intent to balance the shorter life-span planning of small businesses and timely cost-effective benefits to debtors, against the benefits to creditors.").

authority and discretion to fix a longer period for plan payments.[111] On the other hand, once an objection is filed, the debtor's proposed period of plan payments is no longer given the same deference and the bankruptcy court is tasked with fixing the applicable period of plan payments in a subchapter V case.[112] Whether the bankruptcy court raises the proposed period of plan payments *sua sponte* or there is an objection, the burden remains on the debtor to show that the proposed payment period is fair and equitable. At the conclusion of a confirmation hearing involving the court fixing the period of plan payments under § 1191(c)(2)(A), the bankruptcy court can: (1) find that a three-year plan period is fair and equitable and confirm the plan, (2) find that the three-year plan period is not fair and equitable and deny confirmation of the plan, (3) fix a longer plan period not to exceed five years and confirm the plan, or (4) determine it has insufficient evidence to fix the plan period and deny confirmation.

Since the Bank filed an objection to the Debtor's Plan asserting that the three-year period of payments is not fair and equitable under 11 U.S.C. § 1191(b) and (c), this Court must determine whether the Debtor's plan payment period in this case should be fixed at three years, five years, or some other period in between. After reviewing the Plan, listening to the legal arguments, and considering the evidence presented at the confirmation hearing, this Court considered the totality of the circumstances present in this case and analyzed the following

---

[111] Of course, as was noted earlier in this opinion, the Court has an independent duty to determine whether the plan satisfies all of the requirements necessary for confirmation. *See supra* note 52. Furthermore, per Judge Paul W. Bonapfel: "[t]he court's authority to fix the commitment period [under 11 U.S.C. § 1191(c)(2)] implies that the court may raise the issue [of plan duration] *sua sponte*." *See* Hon. Paul W. Bonapfel, *Guide to the Small Business Reorganization Act of 2019* at 152 (2020) (rev. June 2022). A copy of this guide is available at https://www.ganb.uscourts.gov/sites/default/files/sbra_guide_pwb.pdf. Judge Bonapfel originally issued the Guide in February 2020 and has updated the Guide several times. This Court reviewed the version that was revised and updated in June 2022.

[112] *See In re Orange Cnty. Bail Bonds, Inc.,* 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022) ("As part of the streamlined, flexible process under subchapter V, the Bankruptcy Code sets a baseline requirement that a debtor commit three years of projected disposable income, while it also affords the bankruptcy court discretion to require more as a condition of finding a plan fair and equitable.").

factors in determining whether the Debtor's three-year period of plan payments is fair and equitable:

    i.    Capital reserves or capital expenditures during the period of plan payments;[113]

    ii.   Reasonableness of income and expenses set forth in the plan projections during the period of plan payments as compared to historical operations and operations during the post-petition, pre-confirmation time period;

   iii.   Salary and/or other payments to insiders during the period of plan payments;

   iv.   Risks and consequences of a longer period of plan payments; and

    v.   Any other unique or extraordinary facts specific to the case.

Before analyzing each of the above factors in the context of this case, the Court wants to make it clear that (1) the burden is on the Debtor to prove that each of these factors support the period of plan payments set forth in the proposed Plan, (2) these factors are not exclusive, and (3) no factor alone is dispositive or controlling as to the bankruptcy court fixing a plan payment period under § 1191(c)(2)(A).[114] The Court finds these factors to be instructive in this Court's analysis of the totality of the circumstances and its decision to fix a time period for payments of projected disposable income in a subchapter V plan.

    i.   *Capital Reserves or Capital Expenditures during the Period of Plan Payments*

In this case, the Debtor's Plan projections include a "miscellaneous expense" line item in the total amount of $31,816.05 over the three-year period of the Plan. The Court construed this

---

[113] *See Urgent Care*, 2021 WL 6090985, at *9; *See also* Hon. Paul W. Bonapfel, *Guide to the Small Business Reorganization Act of 2019* at 146 (2020) (rev. June 2022) ("Questions may arise when the debtor wants to establish a reserve for various purposes, such as capital expenditures that are anticipated . . . or when the debtor needs to use income to grow the business . . . to improve its profitability. Creditors may reasonably argue that the disposable income they must receive should not be depleted when the debtor will gain the benefit of the investment of income in the business.").

[114] *See Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (describing the bankruptcy court's analysis in the "good faith" context as an analysis based on a conglomerate of factors, but not any single fact). The Court adopts a similar "conglomerate of factors" analysis here.

as a capital reserve. The Debtor stated generally that the reserve would address expense items that might arise during the term of the Plan. The Debtor offered no evidence of (1) the basis for such reserve and how it was calculated, (2) whether it historically had a capital reserve, (3) planned future equipment purchases or other planned future purchases, (4) any cyclical nature of its revenue, (5) future debt financing, or (6) specific costs and expenses in the operation of a medical clinic that are not accounted for in the Plan projections, but may arise during the period of payments under the Plan. The capital reserve amount of $31,816.05 over three years is closely scrutinized when the total distribution to unsecured creditors over the same three-year period is only $38,761.29. It may be that such capital reserve amount is reasonable in this case, but the Court does not have sufficient evidence to make that determination. Without such evidence, it appears that the Debtor is gaining the benefit of a capital reserve and potential future growth of the business at the expense of the unsecured creditor class. Accordingly, the Court is unable to find that the capital reserve is reasonable in the context of the Debtor's proposed three-year plan period under § 1191(c)(2)(A).

Based on the foregoing, there is insufficient evidence of this factor for the Court to determine whether the three-year plan payment period is fair and equitable under § 1191(b) and (c)(2)(A). There is also insufficient evidence of this factor for the Court to "fix" a longer plan payment period not to exceed five years under § 1191(c)(2)(A).

ii. *Reasonableness of Income and Expenses set forth in the Plan Projections during the Period of Plan Payments as Compared to Historical Operations and Operations during the Post-petition, Pre-confirmation Time Period*

The Debtor has been in business since 2018, yet offered no evidence of historical income and expenses compared to the Plan's projected income and expenses. The Debtor offered no evidence of the basis or methodology that it utilized in calculating projected income and

expenses during the three-year period of plan payments. Mr. Payne generally testified that the Debtor operated on a lean budget in the post-petition, pre-confirmation period, but offered no specific testimony regarding the differences between the Plan projections and the actual income and expenses during the post-petition, pre-confirmation period. Mr. Payne further testified generally that the increase in expenses in the Plan projections is due to (1) an increase in advertising, (2) the Debtor's intent to expand services, (3) marketing to the local college, and (4) other services for college students and younger families. These increased expenses are questionable given Debtor's total revenue[115] projections set forth in the Plan are much less than the gross revenue from 2021 in the amount of $1,407,787.00, and the gross revenue from 2022 in the amount of $1,203,604.01.[116] The Debtor offered no explanation as to why projected revenue under the Plan is less than 2021 and 2022 revenue if the Debtor is increasing advertising and expanding services. There is some evidence in the schedules and monthly operating reports that revenue has decreased, but no explanation or evidence was offered to explain such decrease. Without such evidence, the Court is left to question the necessity of increasing expenses for advertising and services if there is no corresponding benefit to the Debtor and the Debtor's creditors. Additionally, without more evidence regarding the Debtor's historical operations and specific evidence regarding the basis for the Plan projections, the Court is left to guess as to the basis for the Plan projections and cannot determine whether they should weigh in favor of the Court finding that the three-year plan payment period is fair and equitable under § 1191(b) and (c)(2)(A).

Based on the foregoing, there is insufficient evidence of this factor for the Court to

---

[115] In the Plan at ECF No. 73, "Total Revenue" is revenue before expenses, so it can fairly be compared to "Gross Revenue" on the Debtor's schedules at ECF No. 1.
[116] ECF No. 1 at 32.

determine whether the three-year plan payment period is fair and equitable under § 1191(b) and (c)(2)(A). There is also insufficient evidence of this factor for the Court to "fix" a longer plan payment period not to exceed five years under § 1191(c)(2)(A).

        *iii.*        *Salary and/or other Payments to Insiders during the Period of Plan Payments*

The Debtor offered no evidence of historical income, payments, and/or distributions to insiders since the Debtor began operations in 2018. According to the Debtor's schedules, Jason Payne—the Debtor's principal—received approximately $3,376.22 per month in the year leading up to the Debtor's bankruptcy filing.[117] In the post-petition, pre-confirmation period, Mr. Payne received approximately $3,235.04 a month.[118] Over the three-year life of the Plan, the "Insider Payroll" expense increases to an average of $7,491.08 per month.[119] In other words, Mr. Payne's compensation will increase by more than 100% compared to the pre-petition period if the Court approves the Plan. Mr. Payne testified that he became licensed as a nurse practitioner after the filing of the Petition and his new license—combined with his increased involvement— warrants his elevated salary in the Plan projections. However, Mr. Payne offered no evidence to establish that this is a fair market rate salary for a person of Mr. Payne's experience and qualifications.[120]

In *Urgent Care*, the debtor's president—and majority shareholder—testified that the salary he drew from the debtor was substantially below market value.[121] Urgent Care's president

---

[117] ECF No. 1 at 33.

[118] ECF No. 40 at 4.

[119] ECF No. 73 at 17.

[120] Debtor's counsel mentioned at one point during the confirmation hearing that the increased insider pay was for two insiders, presumably Jason Payne and his wife Laura Payne. However, no testimony was presented on the work or services provided to the Debtor by Laura Payne, and during Jason Payne's testimony, he explained that the insider payroll increase was a result of his increased qualifications and increased involvement in the Debtor's operations. Laura Payne's involvement with the Debtor was not mentioned or discussed further.

[121] *In re Urgent Care Physicians, Ltd.*, No. 21-24000-BEH, 2021 WL 6090985, at *4-5 (Bankr. E.D. Wis.

also deferred $30,000 in post-petition wages, which he would not seek to recover until after Urgent Care's three-year bankruptcy plan was complete.[122] Urgent Care's president also testified that the family members on his payroll would take reduced salaries, and that he had been providing services to Urgent Care through his other business ventures at a below market rate in an effort to keep Urgent Care afloat.[123]

In the case before the Court, no evidence of this sort of "belt-tightening" behavior has been presented.[124] In fact, the evidence before the Court is that Mr. Payne is *increasing* his salary as part of the Plan. A significant increase in insider pay under these circumstances suggests that this factor should weigh against a determination that the proposed three-year Plan is "fair and equitable" under § 1191(b) and (c)(2)(A). Like the capital reserve factor above, it may very well be that the increased insider salary is reasonable in this case (or perhaps a gradual increase each year is reasonable), but the Court does not have sufficient evidence to make that determination.

Based on the foregoing, there is insufficient evidence of this factor for the Court to determine whether the three-year plan payment period is fair and equitable under § 1191(b) and (c)(2)(A). There is also insufficient evidence of this factor for the Court to "fix" a longer plan payment period not to exceed five years under § 1191(c)(2)(A).

---

Dec. 20, 2021) ("[Debtor's president] testified that his salary is supposed to be $240,000 per year, but he has not received that amount in several years because he adjusts his pay to account for the needs of the clinic. . . . [H]is salary also is significantly lower than what his colleagues are paid. Prior to opening the debtor, he had a comparable position with Prevea Health in the Green Bay area, with a salary between $400,000 and $500,000 a year.").

[122] *Id.* at *4.

[123] *Id.* at *5.

[124] *See In re Buntin,* 161 B.R. 466, 468 (Bankr. W.D. Mo. 1993) (noting that an implied condition of receiving a discharge is that debtors demonstrate a sincere effort to "tighten their belts" to prevent the need for additional relief in the future).

Congress intended for subchapter V to make small business reorganizations easier.[125] The bankruptcy courts should be conscious of this intention, but do so without unfair prejudice to the creditors. The Court should weigh the potential risks and consequences of a longer period of plan payments and in doing so properly balance the interests of the debtor as well as the debtor's employees, customers, and creditors. For example, if a debtor's management or key employees have agreed to take pay cuts for three years, the bankruptcy court should carefully evaluate whether extending the plan, and the corresponding pay cuts, would likely result in the loss of critical staff and substantially impact operations. The bankruptcy court should also consider any other facts that suggest that a longer period of plan payments increases the risk of the business failing. Finally, the potential risks and consequences of a longer plan period should be based on something more than conjecture and speculation.

For example, the debtor in the *Urgent Care* case was able to show the bankruptcy court that (1) a secured debt was going to mature during the three-year plan payment period, (2) the debtor's principal was voluntarily deferring some portion of wages during the three-year plan payment period, and (3) a related entity owned by the debtor's principal agreed to defer the collection of post-petition charges owed by the debtor until after the three-year plan payment period.[126] These were actual, substantiated facts shown by the Debtor that weighed against a longer period of plan payments. The *Urgent Care* court acknowledged that the "simple math of an extended plan term might seem to generate a higher payment to unsecured creditors" but

---

[125] *In re Lost Cajun Enterprises, LLC*, 634 B.R. 1063, 1066 (Bankr. D. Colo. 2021) ("The legislation's central purposes are to streamline and reduce the costs of small Chapter 11 cases thereby allowing small businesses to survive); H.R. REP. NO. 116-171, at 1-2 (2019).
[126] *Urgent Care*, 2021 WL 6090985, at *5 and *10.

determined based on the facts of that case that a longer plan payment period would increase the risk of business failure.[127]

The facts in this case are distinguishable from *Urgent Care*. The Debtor's principal in this case has proposed a significant raise for himself, and the Plan's payroll projections for W-2 employees and 1099 contractors in months 1-12 amount to $34,965.76 per month.[128] In the post-petition, pre-confirmation period, the Debtor's payroll for W-2 employees and 1099 contractors was approximately $28,786.92 per month.[129] In other words, the Debtor's principal will receive a greater than 100% raise, and the Debtor will increase payments to employees and contractors by roughly 21%. While it is possible that these increases are reasonable and justified, the Debtor did not provide the Court with the necessary evidence to support that conclusion. The Court did not receive any evidence about reasonable explanations for the increases, such as inflation or increased competition in the local job market. The Court declines to assume facts not presented in evidence, and these increases were not sufficiently justified to the Court on the record at the confirmation hearing. Furthermore, unlike the *Urgent Care* debtor, the Debtor in this case offered no evidence of actual, substantiated risks and consequences that make business failure more likely if a three-year plan payment period is not approved.

Under this factor, the Court also considered the Bank's argument that the Court should

---

[127] *Id.* at *11. In *Urgent Care*, the debtor cut salary payments to insiders, including the Debtor's principal and his son, and deferred some equipment payments because the equipment was owned by a separate entity controlled by the debtor's principal. The debtor's principal testified that he was taking a substantial pay cut by continuing to work at the debtor for his reduced salary, compared to what doctors of his skill and experience could receive in the free market. The *Urgent Care* court considered these facts and determined that extending the insiders' pay cuts for another two years unfairly tipped the balance between creditors and the debtor in the creditors' favor. The court reasoned that forcing employees to take pay cuts for a longer period could result in the loss of key staff. Further, extending the deferred equipment payments could result in confiscation of the equipment. The court found that based on the evidence presented, a three-year plan period was fair and equitable, and a longer period was too risky and would disproportionately favor creditors at the debtor's expense.

[128] ECF No. 73 at 17.

[129] ECF No. 40 at 4.

fix a five-year plan payment period in this case simply because it would increase the payment to the unsecured creditors.[130] While extending a plan will almost always result in a potentially larger distribution to unsecured creditors, the fact that the Debtor could possibly distribute more over a longer plan payment period should not be the sole deciding factor because of course it would always favor the creditor. The Bank's argument that the Debtor could pay more if the plan period were longer without any analysis of the risks and consequences of a longer plan payment period is not sufficient for the Court to fix a longer period of plan payments under § 1191(c)(2)(A).

Based on the foregoing, there is insufficient evidence of this factor for the Court to determine whether the three-year plan payment period is fair and equitable under § 1191(b) and (c)(2)(A). There is also insufficient evidence of this factor for the Court to "fix" a longer plan payment period not to exceed five years under § 1191(c)(2)(A).

### v. Any other Unique or Extraordinary Facts Specific to the Case

The last factor the Court will consider is a catch-all factor to address any unique or extraordinary facts or circumstances specific to a particular case that are not considered under one of the other factors. There has been no evidence or argument offered by the Debtor or the Bank of any unique or extraordinary facts or circumstances present in this case. Accordingly, this factor is not applicable to the Court's determination of whether the proposed three-year plan payment period is fair and equitable, or it should "fix" a longer plan payment period not to exceed five years under § 1191(c)(2)(A).

---

[130] In this case, the Debtor has proposed to pay $38,761.29 on total unsecured claims of $472,698.64. This is roughly an 8.20% payout on unsecured claims. If the Debtor maintained the proposed Plan payments to unsecured creditors for an additional two years (and the Court fixed a five-year plan payment period), the Debtor would pay its unsecured creditors $64,602.57 which is roughly a 13.60% payout. It is not a huge amount, but it increases distributions to unsecured creditors by approximately $26,000. Conversely, the Debtor is receiving a substantial discharge of unsecured debt—more than $400,000.00.

**3. The factors do not support finding that the Debtor's Plan is "fair and equitable" in this case.**

It may very well be that the Debtor's proposed three-year period for plan payments in this case is fair and equitable under 11 U.S.C. § 1191(b) and (c)(2)(A). However, based on the totality of the circumstances, including an analysis of the evidence presented at the confirmation hearing and consideration of the above factors, the Court finds that the Debtor has not met its burden to show by a preponderance of the evidence that the proposed three-year period of plan payments is fair and equitable under 11 U.S.C. § 1191(b) and (c)(2)(A). The Court further finds that there is insufficient evidence for the Court determine if it should fix a plan payment period longer than three years but not exceeding five years.[131] Accordingly, the Court will deny confirmation without prejudice and allow the Debtor an opportunity to file an amended plan.

## VI.   CONCLUSION

In conclusion, confirmation of the Debtor's Plan is DENIED. Based on the evidence presented and an analysis of the factors set forth above, the Court finds that the Debtor has not satisfied its burden to show that the proposed three-year duration of the Plan is "fair and equitable" under 11 U.S.C. § 1191(b) and (c)(2)(A). The Court further finds that there is insufficient evidence for the Court determine if it should fix a plan payment period longer than three years but not exceeding five years under § 1191(c)(2)(A).

**FOR THE REASONS SET FORTH HEREIN, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

1.     The Bank's objection to the Plan based on a lack of good faith pursuant to 11 U.S.C. § 1129(a)(3) is OVERRULED.

---

[131] Plato, *Apology*, THE INTERNET CLASSICS ARCHIVE, https://classics.mit.edu/Plato/apology.html (last visited May 1, 2024) ("For I was conscious that I knew nothing . . . .").

2.      The Bank's objection to the Plan pursuant to 11 U.S.C. § 1191(b) and (c) is SUSTAINED.

3.      Confirmation of the Debtor's Plan is DENIED without prejudice.

4.      The Debtor is granted leave to file an amended plan on or before June 10, 2024, along with a redline comparing the amended plan to the original Plan filed at ECF No. 73.

5.      If the Debtor does not file an amended plan on or before June 10, 2024, then the case will be *sua sponte* dismissed without prejudice.

# # #

# VII.    APPENDIX 1 – Debtor's Three-Year Projected Budget

| Ordinary Income/Expense | Months 1-12 | Months 13-24 | Months 25-36 |
|---|---|---|---|
| **Revenue** | | | |
| Total Revenue | $1,055,360.00 | $1,065,913.60 | $1,076,572.74 |
| | | | |
| **Expenses** | | | |
| Employee Payroll(W-2) | $150,629.00 | $152,135.29 | $153,656.64 |
| Contractor Services(1099) | $268,960.12 | $271,649.72 | $274,366.22 |
| W2 Insider Payroll | $89,000.00 | $89,890.00 | $90,788.90 |
| Payroll Taxes | $28,000.00 | $28,280.00 | $28,562.80 |
| Medical Disposal/ Shredding | $5,000.00 | $5,050.00 | $5,100.50 |
| Office Rent/Lease | $86,625.24 | $87,491.49 | $88,366.41 |
| Utilities (Electricity and Water) | $23,140.00 | $23,371.40 | $23,605.11 |
| Inventory Purchases | $165,815.00 | $167,473.15 | $169,147.88 |
| Equipment (Maintenance) | $2,640.00 | $2,940.00 | $3,240.00 |
| Scrubs | $2,500.00 | $2,525.00 | $2,550.25 |
| Training | $2,200.00 | $2,222.00 | $2,244.22 |
| Insurance (Auto, Gen Liability & Workers Comp) | $30,523.48 | $30,828.71 | $31,137.00 |
| Telephone and Internest | $15,000.00 | $15,150.00 | $15,301.50 |
| Permits/Taxes/Licensing | $2,782.00 | $2,809.82 | $2,837.92 |
| CPA | $12,000.00 | $12,120.00 | $12,241.20 |
| Staff Meals | $4,800.00 | $4,848.00 | $4,896.48 |
| Office Supplies | $13,000.00 | $13,130.00 | $13,261.30 |
| Website/Software | $65,000.00 | $65,650.00 | $66,306.50 |
| Advertising | $30,000.00 | $30,300.00 | $30,603.00 |
| Medical Director | $12,000.00 | $12,120.00 | $12,241.20 |
| Misc Expenses | $10,500.00 | $10,605.00 | $10,711.05 |
| | | | |
| **Total Expense** | ($1,020,114.84) | ($1,030,589.59) | ($1,041,166.08) |
| **Net Operating Income** | **$35,245.16** | **$35,324.01** | **$35,406.65** |

## VIII.   APPENDIX 2 – Debtor's Three-Year Projected Plan Payments

| PLAN PAYMENTS | | | |
|---|---|---|---|
| Claim | Months 1-12 | Months 13-24 | Months 25-36 |
| **Priority Claims** | | | |
| Ector CAD | $944.92 | | |
| | | | |
| **Secured Claims** | | | |
| American Momentum Bank | $20,569.80 | $20,569.80 | $20,569.80 |
| | | | |
| **Allowed General Unsecured Claims** | | | |
| Allegran Inc | $454.08 | $454.08 | $454.08 |
| American Momentum Bank fka Security Bank | $7,657.20 | $7,657.20 | $7,657.20 |
| McKesson Specialty Care Distribution | $258.48 | $258.48 | $258.48 |
| Merz North America | $197.64 | $197.64 | $197.64 |
| SBA | $4,353.24 | $4,353.24 | $4,353.24 |
| | | | |
| **Annual Plan Payment** | $34,435.36 | $33,490.44 | $33,490.44 |
| | | | |
| **Total Remaining After Plan Payments** | **$809.80** | **$1,833.57** | **$1,916.21** |